**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN W. SCOTT,**

                    **Plaintiff,**

                                                                **1:07-CV-221**
                                                                **(NAM/RFT)**

**v.**


**MARTIN HAND,**

                    **Defendant.**
_____

**APPEARANCES:**

Sussman & Watkins
Michael H. Sussman, Esq.
P.O. Box 1005
Goshen, NY 10924
_For Plaintiff_

McCabe & Mack LLP
David L. Posner, Esq.
63 Washington Street
P.O. Box 509
Poughkeepsie, NY 12602-0509
_For Defendant_

**Hon. Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff John Scott brings this action pursuant to 42 U.S.C. § 1983 against defendant

Martin Hand, Highway Superintendent for the Town of Shawangunk, New York ("the Town" or

"Shawangunk") alleging that defendant violated his First Amendment rights by "ditching" the

front of his property after plaintiff wrote several letters to the editor of the local newspaper which

were critical of the Highway Department.  Plaintiff seeks compensatory and punitive damages.

Presently before the Court is defendant's motion for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure.

## II.     BACKGROUND

The facts from the parties's submissions are set forth to the extent relevant to the

disposition of the instant motion and are undisputed unless otherwise noted.  In 2004, plaintiff,

who resides on Marl Road in the Town of Shawangunk, wrote two letters to the editor of the

Wallkill Valley Times, a weekly newspaper in the Town of Shawangunk.  In the first letter, dated

March 12, 2004, plaintiff wrote:

> BEWARE Residents of
> Town of Shawangunk
>
> On March 5th, when I went to check on Old Chapel Cemetery that my brother and I
> have taken care of for the last 34 years - I was in SHOCK!
>
> The image I felt was I knew how the Jews felt when Hitler stripped them of their
> rights and loaded them on box cars.
>
> The highway department and it's [sic] motorized brush cutter had left the cemetery
> like a war zone.  Tree's [sic] growing there for 100 years were stripped bare on one
> side up 12-15 feet.  Lilacs and other flowering plants were chewed up and damaged.
> This was 5-6 feet from the ditch and across a low fence.
>
> It is hard to believe Mr. DeWitt and Mr. Garrison would condone this as their families
> own funeral homes.
>
> If they can do this to a cemetery, imagine what they can do to your front yard.  I need
> the people who voted these officials into office to tell them you don't want this to
> happen to you or your neighbors.
>
> John W. Scott

Defendant's Ex. D, Plaintiff's Dep., p.17.

Plaintiff stated in his deposition that he and his brother had maintained the cemetery for

2

thirty-four years.  Plaintiff asserted that he spoke to a Town Supervisor at a Town Board meeting about his "displeasure with the treatment of the cemetery", and that the Supervisor told plaintiff he would "check on it."  Plaintiff testified that he learned from his brother that the Supervisor said he "was going to put up a historical marker and a new gate to compensate for the damage to the shrubbery."  Because "nothing happened," plaintiff addressed the Town Board at the Town Board meeting.  As a result of the Town Board meeting, plaintiff wrote the following letter to the editor dated April 5, 2004:

Public Service Lacking

> Over one month ago I wrote to the Town of Shawangunk Supervisor John Valk and his Republican Town Board about damage caused by the Town of Shawangunk Highway brush cutter on the Old Chapel Cemetery.
>
> John Valk and his Republican Town Board have chose to ignore my letter.  Instead they sit on their hands with twinkes in their mouths.  The twinkes represent their salaries that the tax payers of Shawangunk pay them.
>
> Sitting on their hands represents doing nothing for the residents paying their salaries to manage our town.
>
> I am disappointed in their lack of public service and embarrassment to the Republican Party.
>
> . . . .
>
> PS this might make a good cartoon.
>
> John Scott

Defendant's Ex.E, Plaintiff's Dep., p.18, 24.  Plaintiff did not recall when these letters were published.

Defendant stated that he became aware of plaintiff's complaints about the alleged actions of the Highway Department crew ("the crew") in the cemetery when he read about it in the

3

newspaper.  Defendant spoke to plaintiff's brother and, briefly, to plaintiff about these complaints and the brush cutting in the cemetery.  Defendant testified that he told plaintiff that the Highway Department  would "cleanup the brush that we had cut with a machine."  Within a day or two of their conversation, defendant sent a crew to clean up the cemetery.

Every year, the Highway Department maintains, cleans out, and creates drainage ditches as necessary along Town roads in order to control rain water and run off from abutting property and enhance public safety.  Proper water drainage control minimizes icing conditions on the roads.  Prior to starting the ditching in the Town in the spring of 2005, defendant purchased a used Grad-All machine for the department to use for ditching.  Department employee James Greer accompanied defendant to inspect and test the Grad-All and has been its operator since its purchase.

According to Hand, sometime prior to March 30, 2005, the date the crew started ditching on Marl Road, he had received information from crew members, including Michael Carrol, that there was a run off condition in front of plaintiff's home which caused ice to form on Marl Road. Hand stated that based on that information and his own observations, he believed a drainage ditch should be created along plaintiff's road frontage.  Defendant avers that he gave Greer "no special instructions nor made any requests that he do anything different with respect to ditching in front of Mr. Scott's property."  Although plaintiff takes issue with defendant's assertion that he gave no special instructions regarding the ditching in front of his property, plaintiff admits there was a run off condition in front of his home which could cause icy conditions on the road.

As stated, On March 30, 2005, the Highway Department began ditching on Marl Road. According to defendant, the ditching continued on March 31, 2005, April 11, 2005, April 12,

2005, and April 13, 2005.

In a Letter to the Editor of the Wallkill Valley Times, dated April 10, 2005, plaintiff wrote:

Frustrated by Highway Superintendent's knowledge

(1) Water damage to Marl Road in the Town of Shawangunk.

My Solution:   Clean catch basins in $600,000 engineered drainage program.  On person with shovel one day to remove leaves covering catch basins.

Marty Hands [sic] Solution:   Dig ditches on both sides of road, regardless of pitch with no easements for water run off.  Required large crew with lots of equipment several weeks.

(2) Fill from ditches.

My Solution:   Take fill to school house at bottom of hill to expand parking area for senior citizens.

Marty Hands [sic] solution: Take fill to private parking area at top of hill for improvements.

He even told my neighbor that it was harder on trucks to go downhill then uphill. That was why the private parking area was improved at taxpayer expense.

(3) PS Marty you missed one catch basin above my house.

(4) Suggestion: Go help Deerpark for one week, their [sic] in worse shape.

John W. Scott

Defendant's Ex. F, Plaintiff's Dep., p. 47.

This letter was published in the newspaper on April 20, 2005.  Hand testified that he read this letter in the newspaper, was upset, and disagreed with it.  On the last day of ditching, plaintiff observed the Highway Department crew ditching in front of his residence.  Plaintiff testified that the crew dug up the road frontage of his "entire front lawn."  Plaintiff stated that the ditching also

5

destroyed, *inter alia*, perennial plants, a decorative stone, and some shrubs.  Hand testified that "we all knew at some point in time we had to make some type of correction in front of [plaintiff's] property."

The parties agree that the ditching at issue was done on the last day of the ditching on Marl Road.  The parties, however, dispute that date.  Defendant contends that according to his log, the department completed the ditching in front of plaintiff's home on April 13, 2005.  That morning, according to defendant, he told his crew to "finish up Marl Road today . . . .  Nothing specific telling them to go to Mr. Scott's property and ditch in front of him."

Plaintiff stated in his complaint, which is not verified, that "[w]ithin several weeks of the publication of this final letter, defendant dispatched agents employed by the Highway Department to do further work on or along Marl Road."  Complaint, ¶ 13.  During his deposition, plaintiff testified that the Highway department crew returned to his side of the street "a day or two" after the publication of the letter.  Plaintiff's Dep., p.53.  Plaintiff also filed an affidavit in support of his opposition to defendant's motion for summary judgment in which he states that on April 21, 2005:

> I was leaving for a several day trip to Pennsylvania.  At about 8-8:30 A.M., I heard construction down the road and again observed the Town Highway Department working on a hill by Mary Greer's home, which is just south of mine.  It was on this day, the day after my Letter to the Editor was published that I saw the highway crew digging ditches in front of my home.  I was shocked by this and, when they finished, I went out and took photos.

¶ 4.  Plaintiff claims he was:

> refreshed in my specific recollection of this sequence of events by a fortuity: in preparing my 2007 tax returns, I opened a safe I keep in my house.  I was looking for materials I needed and came upon a 2005 calendar . . . .  Reviewing this refreshed my recollection about the actual sequence of events.

¶ 6.  Plaintiff testified that he observed that defendant was present during part of the ditching on plaintiff's road frontage.

Following the ditching in front of his property, plaintiff had a sign made criticizing defendant, and put it in the front window of his residence.  Plaintiff left the sign up through the summer and fall and carried it once in Walker Valley and once in Wallkill, both of which are within the Shawangunk township, and displayed it in main intersections.

## III.   DISCUSSION

### A.   Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d

Cir. 1985).

**B.    First Amendment**

To establish a First Amendment retaliation claim, a plaintiff must show that "(1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's action." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (internal citations omitted).

In this case, it is uncontroverted that plaintiff's letters to the editor constituted protected activity.  With respect to the second element, defendant contends that the two letters to the editor plaintiff wrote in 2004 were too distant to show any causal connection between plaintiff's speech and the allegedly retaliatory ditching.  Defendant further contends that his log entries show that his crew completed the ditching in front of plaintiff's residence on April 13, 2005, approximately one week *before* the publication of plaintiff's letter.  Therefore, defendant argues, plaintiff's conduct could not have prompted or caused the Highway Department to ditch in front of plaintiff's residence.  Defendant further asserts that the evidence indicates that he instructed his crew to conduct the ditching on Marl Road, and more specifically, in front of plaintiff's residence prior to March 30, 2005.  Thus, defendant argues, plaintiff's April 20, 2005 letter could not have influenced him.

Even assuming that plaintiff's 2004 letters to the editor do not establish a connection between plaintiff's exercise of his right to free speech and the allegedly retaliatory action, the Court finds there are questions of fact which preclude summary judgment.  Plaintiff has adduced evidence through his deposition testimony and affidavit that defendant's crew began the ditching which damaged his property shortly after his April 20, 2005, letter to the editor was published.

8

Defendant correctly argues that a subsequent affidavit cannot be used to contradict earlier deposition testimony. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (a litigant cannot defeat summary judgment by advancing "factual allegations ... for the first time in the plaintiff's affidavit opposing summary judgment [where] that affidavit contradicts her own prior deposition testimony.").  In this case, however, plaintiff's recollection of when the ditching occurred is consistent to the extent that he maintained in his complaint, deposition testimony, and affidavit that it occurred *after* the publication of his letter to the editor.  Thus, assuming the truth of plaintiff's assertions, a reasonable fact-finder could conclude, given the temporal proximity, that a causal connection exists between the publication of the plaintiff's April 20, 2005, letter to the editor and the subsequent, allegedly retaliatory, ditching in front of plaintiff's residence. *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse . . . action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  Accordingly, defendant's motion for summary judgment is denied.

**IV.   CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**

Date:  September 30, 2008

_____
Norman A. Mordue
Chief United States District Court Judge

9